Good afternoon, Your Honor. May it please the Court. My name is Thomas Doves. I'm from Labaton. We represent the South Carolina Retirement System, the lead plaintiff below and the appellant here. I will address myself to materiality and falsity and then circle back to Scienter. To set the stage for this discussion rather than regurgitate the briefs, I thought it might be useful to set the stage by starting at the beginning of the story in 2012 and the end of the story in 2014 and then fill it in in between in that period when the alleged misrepresentations and omissions were made. It's unrefuted that on May 21, 2012, Eaton announced that it was going to acquire Cooper, a much larger company. The price ended up being $13 billion. More importantly, $7 billion was going to be borrowed as part of the transaction. And indeed, on that very same day, Eaton said that with respect to that $7 billion, it was already thinking about how it was going to So the possible sale of assets was put on the table early by the company, not by any of the analysts. After the transaction was done to give some idea of the magnitude of this, the combination of old Eaton and new Cooper, the net worth of Eaton doubled. So this was a major transaction by a smaller company taking on a lot of debt for a bigger company. Now, there's a lot of talk about spinoffs. I want to spend two seconds on spinoffs. A spinoff obviously is where a, let's call it a principal company, spins off the stock of a subsidiary and the shareholders of the subsidiary own the stock. There's no cash that changes hands. So what does that have to do with Well, the trick, if you want to put it that way, is that when you spin it off, you can allocate part of that debt from the big company, the principal company, down to the company that you're spinning off. That way you get it off the books of the company, the crown jewel that you really care about, Eaton slash Cooper. And indeed, the bigger the spinoff, the more debt you can get off the books. And the tax-free element of this, the incentive there is if you can make it tax-free, you can make this assumption of debt by the new owners more palatable. And what that does is create incentives to get rid of your older subsidiaries, your older businesses where the tax base is so low. So all of that adds together to create tremendous incentives to lower this massive amount of debt. And that is the theme, addressing the debt that runs through this entire situation. Now, let's jump to the end. In 2014, there is no doubt that Eaton made a disclosure quoting from 164 in the complaint, which is in the appendix at page 368. Mr. Cutler, who was the head man at Eaton and who was the architect of this whole transaction, said, quote, we are not able to do a tax-free spin of any business for five years post the acquisition date of the Cooper transaction. He went on to say that limitation means any spin would result in a very significant tax liability. He says this is a five-year prohibition. Prohibition is his word. Help me with the record reference to which you've just adverted. It's at paragraph 164 of the amended complaint at page A368. Right. So it's a prohibition in his words. If we go to the next page, 369, the CFO goes into how this is not a simple analysis. It's a complex tax question. And then most importantly, for our purposes, on page in paragraph 168, Mr. Cutler takes the stand again and says, this is not new knowledge. Not new knowledge. We've been well aware of this all along. Now, that was in response to some annoyed questions from analysts saying, why are we learning about this right now if it's been built into this since the day you bought Cooper? All right. So what we have here is what we respectfully submit is an admission that they knew of this tax restraint and its consequences way back in 2012. And as we will see, they didn't tell people about it. What happened next? After this announcement was made in July, several things happened, all of which go to materiality. That very day, the stock dropped 8.2 percent. It dropped $3 billion in one afternoon. $3 billion in one afternoon, which is the largest stock drop that this company ever experienced. All of the analysts, I repeat, all of the analysts that were covering the company said that that stock drop was directly related to the description and the disclosures of the tax restrictions that were made in the statements. In addition, a number of the analysts from prominent investment banks downgraded their views of Eaton. All of this under this Court's decision in Scholastic, this criticism, this reaction by the analysts is relevant and probative of materiality. So let's go to what happens in between the two bookends. There are a number of misrepresentations. Let me take a couple of them just to walk you through them. And I can be criticized for taking the juiciest ones, but so be it. Paragraph 190, this came on the day of the announcement of the transaction. Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive parts at any time? Mr. Cutler says, quote, there is nothing in the deal per se that would prevent us from taking portfolio moves, but we have no such plan. I'll get to the no such plan in a minute. But he denies that there's anything in the deal that stops it. Second, going into October, another question. In 2013, is there anything from a regulatory I'm sorry, Your Honor. Anything about the tax consequences in that last statement that you there's nothing that he said at the outset. There was nothing. There's nothing in the deal that would prevent us from taking portfolio moves. Right. That is the operative. That means there's nothing in the deal that would prevent us from spinning off or one of these subsidiaries or divisions, notwithstanding the tax restraints. And we submit that is totally inconsistent with what I just read to you two minutes ago when the disclosure was made. Where were the words notwithstanding the tax? Well, it it it doesn't say notwithstanding the tax that that that is correct. But we were all but one has to understand that you could sell a subsidiary for cash for a couple hundred million dollars, which they did somewhere along the line. But if you're looking to reduce this debt dramatically, which is what all the analysts were pushing for, then you're going to have to have a large a spinoff in order to get that debt moved off the balance sheet of the parent. That's correct, isn't it? That is a matter of law and the agreement. Nothing precluded them from doing it. There would be serious tax consequences, but they weren't precluded from doing it, I thought. Well, that's the interpretation of the court below. If something is impractical and impractical and impossible as a practical economic. Practical and impossible are two different concepts. Well, Mr. Cutler called it a prohibition. Let's stick with pro. I will stick with a prohibition. They couldn't do a tax spinoff because of these various. We get to the what does it matter because they're stating that there was no intent to do it at that time and the district court thought that they were under no obligation to disclose the consequences of something they had no intention of undertaking. Why isn't that correct? It's incorrect. First, because the district court did not give us the benefit of our And as locked in stone, there are various denials that said we had no plans to do this. But they said this a half a dozen times and they always hedged it. They said we have no plans. We have no plans now. At the present, we don't have a plan. Well, what's wrong with that? There's nothing wrong with it, but it means that things can change. It doesn't mean that the thing is locked in. And that's the point. They can change it and they accept for the fact that the tax restrictions make it economically impossible unless they're being suicidal, which we can't. Mr. Dubs, you've reserved some time. Thank you. We're here for Mr. Martinez. Good afternoon, Your Honors. May I please the Court, Roman Martinez from Latham & Watkins for Eaton and the individual defendants. Your Honors, plaintiff's theory in this case is that Eaton committed securities fraud by failing to disclose the hypothetical tax consequences of a hypothetical spinoff transaction that the company repeatedly told the world that it had no intention of undertaking. That theory fails for four reasons. The statements were not false or misleading. They were not made with scienter. They were not material. And nine of the ten statements were made outside the true class period and are thus not properly before the Court. Now, Mr. Dubs started with the beginning and then he went to the end, and I think the middle got a little bit of short shrift, so let me talk a little bit about the middle. The middle is where Eaton repeatedly, over and over again, told the market that it had no intention of spinning off this division. It had no intention of conducting a sale. The reality is that once the transaction, the Cooper transaction was announced, there was a disagreement essentially between the company and between the analysts about what should be done with the vehicles division. The analysts generally thought, as Mr. Dubs ably laid out, they laid out, the analysts thought that there was a theory under which what should happen is that the vehicles division should be sold or spun off for many of the reasons Mr. Dubs laid out. But the company very clearly disagreed. The company said repeatedly that it liked the vehicle business. It didn't want to spin it off. It was clear, truthful, and direct about why it liked the vehicles business. It liked the high returns. It liked the strong cash flow. It liked the role that the vehicles business played in grooming management talent that could then come over to the other parts of the firm. And so the disagreement that you see between the analysts and the company during the two-year class period that's laid out in the complaint, the disagreement between the analyst reports and the company statements, is basically this sort of debate about what should be done with the vehicles division. But the key thing about this period, the key thing about the middle period is that over and over again Eaton addressed the fundamental issue, the core premise, which is, is this spin-off of the vehicles business actually something that the company is considering? Is it actually something that might in reality happen? And they said no. And they said no over and over again. They said no in May 2012, in November 2012, in February 2013, in June 2013, in November 2013, and ultimately in July 2014 once again. So at every step along the way, Eaton was clear, truthful, and direct with the market. Let me talk about some of the various elements of the claims here. First, with respect to falsity, whether they were false or misleading statements, I think there are four key points to keep in mind. Number one, Eaton never said it could do a tax-free spin-off. It never said that. It also never analyzed or addressed the economic feasibility of the spin-off at all until the very end of the class period. Number two, as I said, Eaton was very clear and direct on the fundamental point that the analysts cared about, that the analysts were discussing, which is, you know, is this spin-off transaction going to happen? And Eaton said over and over again that it had no strategic interest in a spin-off, and it had, and it had, as I said earlier. Point number three, this whole post hoc debate that is what this securities case is about, this debate about the tax consequences of a spin-off is a total sideshow because of what I just said. The tax consequences of a spin-off were not the roadblock to the spin-off. The roadblock to the spin-off was the fact that the company didn't want to do a spin-off, and that's what it said to everyone over and over again. And we know that not just because of the words in the complaint. You would say accounts for the, for the drop after the announcement was made. I think, Your Honor, I think what would happen. I mean, wasn't there an assumption in the market that there would be? And from where did that assumption come? I think the, to the extent that there was an assumption in the market, it came from the fact that the analyst kept pushing this theory, which I think Mr. Dubbs maybe shared that it would have been a good idea to do a spin-off, but which Eaton's management most emphatically did not share, the analyst kept pushing this theory even in the face of the repeated statements by Eaton that it didn't want to do a spin-off. And I think it's important to note, Your Honors, that it's not just the statements. You know, the company was clear over and over again, as I said, but even after the five-year window in which the tax-free spin-off couldn't happen, even after that period expired, that was about two years ago, Eaton still didn't do the transaction. So if it was such a great idea, as the analyst say and as Mr. Dubbs says, Eaton would have done it. But that really, it was immaterial. It didn't have any role in the, it didn't have a role in the decision-making process because Eaton had made a fundamental strategic calculation that it wanted the vehicle's business and it wanted to keep the vehicle's business in the company as a whole. I think ultimately what this whole debate really shows is that the plaintiff's real complaint in this case, their core issue, is not that Eaton was lying, but rather that the analyst didn't believe us when we were telling the truth. So we said that, we said we were very truthful and direct with the market. It's not our fault, though, that the analyst persisted in this mistaken idea that what should have happened here was a spin-off in the face of our repeated statements to the contrary. Our obligation under the securities law was to tell the truth. It wasn't to quash every rumor or to fact-check every analyst that was getting it wrong. And I think if you look to the court's decision in the state teacher's case, this is the one that the district court relied on at JA page 255, here's what the court said. A company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company. Here, the rumors could not be attributed to the company. The rumors are attributed to the analyst reports that had a fundamentally different strategic vision for what should happen with the vehicles division. Who was right in the end? I'm just curious, did the stock ever recover? The stock price I think today is significantly higher than it was both before and after the drop that we're talking about. So it seems like Eaton has managed the company quite well. Although, of course, that's not in the, today's stock price is not in the record, of course. So they have a couple of, you know, they want to nitpick some of the statements. I think I just want to address one or two of them very quickly. With respect to the July 2014 statement, I think it's very, Mr. Dubs quoted from that. This is a statement, I think it's page 368 of the joint appendix. What Eaton said at the end was that there was a prohibition. That's the word that Mr. Dubs emphasized, prohibition. It's true, he said that. But the prohibition was on a tax-free spinoff. It wasn't a prohibition on spinoffs. It was a prohibition on tax-free spinoffs, which, of course, was entirely true and which is, which is, you know, undisputed in this case. And in fact, as Mr. Dubs- Is that a matter of public record? Was which one? That a tax-free spinoff was not permitted? It was certainly, the facts, the relevant facts by which an investor, an analyst could have figured that out were certainly in the public record. And in fact, if you look at two of the sources that Mr. Dubs cites against us at pages 40 and 50 of his brief, these are, these are reports in the M&A Tax Reporter. The analyst there, you know, lays out in just a paragraph or two what the relevant considerations were and explains very credibly, based on the facts that are available in the public, why a spinoff, a tax-free spinoff was, in fact, prohibited. So the July 14th statement was entirely correct. The only other statement that Mr. Dubs decided to talk about was the statement in May 2012 when the question was asked whether Eaton was precluded by any element of the tax structure of the merger to spinoff the Vehicles Division. And the answer to that, Your Honors, of course, it was not precluded. It wasn't impossible to spinoff the Vehicle Division. It wasn't like there was a legal prohibition or a regulation that said, thou shalt not do spinoffs. Or it wasn't like there was something in the contract or the covenants of the Cooper merger that prevented it from doing that. Rather, it was based on a strategic decision by the company that this was not in the company's strategic interests. So I don't think that the statements here are false. I don't think that they were misleading. To the extent that there was a duty to disclose anything, it would have arisen only if the company's own statements had been misleading. Then there would have been a duty to complete the statements or make them correct. But there wasn't any such duty here because the company never said anything that implied it was giving all of the reasons why, all of the considerations that might bear on a to spinoff the Vehicles Division. And the company never said or implied anything that suggested it was discussing all of the tax consequences of any potential hypothetical deal it might actually, you know, at some point want to do, including the ones that it said it decided it didn't want to do. The company didn't say any of that. And then I think more fundamentally, the information that we're talking about here is information that's available in public laws. It's the kind of thing that courts across the country have recognized do not need to be disclosed. I think the heliotype case and the progress energy case that are cited in our briefs are helpful on that. Maybe just a quick word, Your Honors, as to Sienter. You know, we think the falsity issue is absolutely clear on our side. If you think that, if you were to conclude it was somehow murky or ambiguous, Sienter is an even stronger basis for us to prevail. Four quick points there. Obviously, the test under Sienter, under the PSLRA is very demanding. It's hard to satisfy. They've got to show a strong inference of Sienter. Essentially, actual intent or recklessness that approximates actual intent. Here, you know, we don't have any of the classic indicia of bad intent or recklessness. There's no objective lie. There's no smoking gun email. There's no confidential informants. And there's no unusual insider trading stock sales that would suggest that Eaton had any motive to lie. In addition, there's no actual coherent theory here that the other side has as to what was actually going on. So, you know, their theory rests on the idea that Eaton was somehow trying to trick the market into thinking we might actually do this spinoff. That theory is completely incoherent based on the facts pled in the complaint, because as the facts pled in the complaint made clear, Eaton was repeatedly telling the market that it wasn't going to do a spinoff. So how could Eaton simultaneously be trying to trick the market into thinking, yes, spinoff, while at the same time telling the market, no spinoff? That doesn't make any sense. It's not coherent. And finally, that any duty to disclose here wasn't clear, and certainly in this kind of murky circumstance, there isn't a clear duty to disclose. And it's just as plausible that what really happened here is if there was any confusion, it was because despite the fact that Eaton had reasonably tried to clarify its intent to the market, and we think that for all of these reasons, there's no scienter, there's no falsity, there's also no materiality, and we ask the Court to affirm. Mr. Dubs, you've reserved two minutes. Thank you, Your Honor. We wouldn't be here if when the analysts asked specific questions about did the deal structure, did anything else prohibit you from doing something, and they would have said, we have, our tax lawyers have looked at it, and we are operating under a regime where we cannot do anything for five years. That was what was not disclosed. What was the value of that? No one on the other side has explained why do you lose $3 billion and a half a day if nothing is worth it, if that information is just nothing, if the denials of management were so persuasive, if everyone agreed that management had the discretion not to sell this stuff, which it did, and it wouldn't. And saying that these things were possible, they weren't possible. Jumping off the Brooklyn Bridge is possible, but nobody does it. We cannot presume irrationality. These restrictions were real. This is not a rumors case. Irrationality. But if someone tells you they're not going to do something, what does it matter why? Well, first of all, if they tell you you're not going to do something and they say we're not going to do something right now, or we're not going to do something as presently planned, that's different than saying we're not going to do something, we're never going to do something. Also, it's different than saying we're never going to do something, and one of the reasons we're never going to do something is that we are. It may be different, but you know, and we don't have to discuss at length, that the securities law doesn't require that investors be given every piece of information they might like to have. The question is whether there's been a misrepresentation or some kind of material omission. And again, as long as they are telling the market they're not going to spin off and they don't, how is there any material misrepresentation? There's a material Failure to say, and by the way, if we wanted to, we'd face adverse tax consequences. They are forced to come clean when an analyst presents them with a straightforward question that says, is there any restriction on you doing this or that? And they know there's a restriction. Now, they can say what the restriction you've identified the restriction, that takes us back to our first exchange where I said to you, there is no legal or transactional restriction. It's that it wouldn't be a practical thing to do, given the taxes they'd face. Well, it would be And they say there's no prohibition. Aren't they stating a true statement? There is a prohibition is what they said, and the prohibition is the tax consequences. They say that's a prohibition against doing Later, but your misrepresentation is that they didn't say that there was a prohibition earlier. That's correct, Your Honor. And, but the prohibition is not legal or contractual. It is legal. And it wouldn't make economic sense. Well If they could spin off, they'd face very serious tax consequences. It's not doable. We I mean, we have alleged we have an investment banker saying it's not doable. It's we have alleged it's not doable. It's not rational. We have to assume that they're that they the businessmen are irrational. Now, as to your honor's point about the misrepresentation, if the analysts said to them, what are you guys going to do about the debt? That would be sufficiently general that we wouldn't be here. But when they are put to the metal and said, is there a is there a limitation in the deal? Is the red covenant? Is there something like that that says you can't do it? And it's very specific. And they deny that. And then just add at the end as a get out of jail free card. But we have no intention of doing it. And I must be terribly confused. But what is there in the covenant that prohibits them from doing it? There is nothing in the covenant. That's what you're saying. They were specifically asked, is there anything in the covenant? By the way, I'm not sure that was the question. And they say no. And that's a misrepresentation. That's incorrect. If it's limited, I was being more general than perhaps I should have. If the word was covenant and it was limited to covenant, no. If the question was, is there anything in the deal that says you can't do that? The answer to that is yes. And the reason it's yes is because the tax consequences are absolutely prohibitive. And you cannot in the real world do this deal. And I would urge the Court to look at all these statements that everybody says are unequivocal statements that they're not going to spin off. And they're all hedged. They're all hedged one way or the other. And the $3 billion drop, someone has to come up with an answer for why the $3 billion disappeared. We're trying to protect investors. They lost $3 billion in one afternoon. And was this all just because of irrationality and because of, you know, analysts off on a toot? No. They had expectations, and they had expectations not just from the analysts, but in response to the analysts' questions as to what the options were facing the company. And an option, even if not exercised, an option, even if not exercised, has value. And that value was apprised by the market at $3 billion. Thank you. Thank you, Mr. Dunn. We'll reserve the decision.